11-6616.132-RSK                                    December 19, 2013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE SNEED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 6616 |
| | ) | No. 11 C 7082 |
| | ) | (Consolidated Cases) |
| CITY OF HARVEY, a municipal | ) | |
| corporation, ERIC KELLOGG, | ) | |
| individually and as Mayor of the | ) | |
| City of Harvey, BETTIE LEWIS, | ) | |
| individually and as Corporation | ) | |
| Counsel, DENARD EAVES, | ) | |
| individually and as Chief of | ) | |
| Police, LAVANDUS KIRKWOOD, | ) | |
| individually and as Internal | ) | |
| Affairs Investigator, CAMERON | ) | |
| FORBES, individually and as | ) | |
| Commander of Patrol, SANDRA | ) | |
| ALVARADO, individually and as | ) | |
| Secretary to the Chief, and | ) | |
| MARCUS PATTERSON, individually and | ) | |
| as Former Commander of Harvey | ) | |
| Police, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

Before the court is the defendants' motion for summary judgment. For the reasons explained below, we grant the defendants' motion in its entirety.

### BACKGROUND

Pro se plaintiff Andre Sneed, a former City of Harvey police officer, has filed a sprawling ten-count complaint against the City of Harvey, its mayor, its corporation counsel, and various members

- 2 -

of its police department. Sneed's contentious tenure at the Harvey
Police Department ("HPD") began in May 2007 when he joined the
department and was assigned to its Special Operations Unit ("SPU"),
a division responsible for investigating gang and drug crimes.
(See Defs.' Local Rule 56.1 Stmt. of Undisputed Material Facts
("Defs.' Stmt.") ¶ 4.)[1] Sneed claims that in 2008 he and former
HPD police officer Archie Stallworth conducted a covert
investigation of an alleged drug trafficker named Carlos Vargas.
(See id.) Vargas was actually an undercover FBI agent and
Stallworth was tried and convicted for agreeing to provide off-duty
security for what Stallworth believed to be a large drug
transaction. (See id. at ¶ 6); see also United States v.
Stallworth, 656 F.3d 721 (7th Cir. 2011) (affirming our denial of
Stallworth's motion for a new trial).[2] Stallworth argued at trial
that it was all just a misunderstanding. He was actually
conducting his own sting of Vargas, and in support of that defense
he relied on a report that Sneed had submitted to Commander Michael
Neal in or around May 2008. See Stallworth, 656 F.3d at 725.

---

[1] Sneed asks us to deny the defendants' motion for summary judgment
because the defendants' Rule 56.1 statement routinely and improperly recites
multiple facts within the same numbered paragraph. (See Sneed Resp. at 5-6.)
We agree with Sneed that some paragraphs violate Local Rule 56.1. (See, e.g.,
Defs.' Stmt. ¶¶ 5-6, 13, 40, 52, 59, 63-64, 66.) On the other hand, denying the
defendants' motion outright on that basis would only prolong an already lengthy
case. If we suspect that Sneed has failed to respond to a particular fact
through oversight, we will construe his silence as a denial. So, Sneed will not
be prejudiced by the defendants' violations of Local Rule 56.1.

[2] By coincidence, Sneed's civil suit was randomly assigned to the same
judge that conducted Stallworth's criminal trial.

- 3 -

Sneed contends that the report was "related" to the Vargas investigation, (see Pl.'s Resp. to Defs.' Stmt. ¶ 5), but the original report only generically described a drug-trafficking investigation without disclosing Vargas's role.  See Stallworth, 656 F.3d at 725.[3]  After the FBI interviewed Stallworth in connection with the sting, Stallworth prepared a two-page memorandum describing his purported investigation and attached it to Sneed's report.  Id.  Sneed then logged the falsified report into the HPD's evidence room — contrary to department protocol — and Stallworth later subpoenaed it to bolster his alibi.  Id.  This ruse was the basis for Stallworth's conviction for falsifying a police report to impede an investigation.  Id.; see also 18 U.S.C. § 1519.  Sneed was never charged with any crime and he was not called to testify at Stallworth's trial.  Sneed contends that he would have offered to testify that Stallworth was innocent, but defendant Denard Eaves — Harvey's Chief of Police — told him to "keep [his] mouth shut."  (Defs.' Stmt. ¶ 6.)[4]  After Stallworth was arrested in November 2008, the HPD disbanded the SOU and

---

[3]  Indeed, Neal testified at Stallworth's trial that Sneed told him that he did not want Neal to file the report.  It sat in Neal's desk for several months until Sneed asked him to file it after Stallworth's arrest.

[4]  Stallworth sought a new trial based on Sneed's allegation that Eaves ordered him not to testify at Stallworth's trial.  We denied his motion.  See United States v. Stallworth, No. 08 CR 948, 2012 WL 5381229, *6 (N.D. Ill. Oct. 31, 2012); see also id. at *3 (Testimony by Sneed that he and Stallworth had been working together on a sting operation directed at Vargas, that Stallworth's two-page addition had been clipped to Sneed's initial report on or shortly after the events of August 11, 2008, and that Eaves had threatened Sneed with dismissal or suspension if he testified to that effect, would not have been credible and therefore would not have had a possibility of resulting in an acquittal.").

- 4 -

reassigned Sneed to another division. (Id. at ¶ 7; see also Sneed
Dep., attached as Ex. B to Defs.' Stmt., at 24 (stating that he was
transferred to the Patrol Division).)[5] The parties appear to agree
that Sneed was placed on administrative leave shortly after his
reassignment. The defendants contend that Sneed was placed on
leave pending an investigation of the SOU, but the evidence they
cite does not support that assertion. (See Pl.'s Resp. to Def.'s
Stmt. ¶ 7.)[6] Sneed believes he was placed on administrative leave
because he "[s]poke out about [Eaves] not supporting his
subordinates [i.e., Stallworth]." (Sneed Dep. at 119-20; see also
id. at 107-08.)

It appears that Sneed returned to work very briefly — a few
weeks at most — before he was placed on medical leave in January
2009 for a shoulder injury he claimed he received after falling at
police headquarters. (See Pl.'s Resp. to Defs.' Stmt. ¶ 8; see
also Sneed Dep. at 155-56.) Approximately four months later, on
April 21, 2009, Sneed's psychiatrist Dr. Rian Rowles declared Sneed
unfit for duty because he was suffering Post-Traumatic Stress

---

[5] Sneed testified that he believed that two officers remained in the SOU,
but this was just speculation based upon the fact that they continued to report
to work in plain clothes. (See Sneed Dep. at 18-19, 27-28.)

[6] The defendants cite Eaves's affidavit, but it does not mention Sneed's
administrative leave. (See Defs.' Stmt. ¶ 7; Eaves Aff., attached as Ex. C to
Defs.' Stmt.) And as Sneed points out, Eaves appeared to testify at his
deposition that he could not recall why Sneed was placed on administrative leave.
(See Eaves Dep., attached as Section 7 to Pl.'s Resp. to Defs.' Stmt., at 249.)
Sneed maintains that he was never told why he was placed on leave. (See Sneed
Dep. at 113-16.)

Disorder ("PTSD"). (See Defs.' Stmt. ¶ 8.)[7]  On April 1, 2010,
Sneed filed a "Charge of Discrimination" with the EEOC claiming
that the City of Harvey had denied him an unspecified "reasonable
accommodation." (See Defs.' Stmt. ¶ 28; see also Charge of
Discrimination, dated Apr. 1, 2010, Supp. to Group Ex. N to Defs.'
Stmt.)[8]  In a letter dated April 21, 2010, Dr. Rowles reported that
Sneed had suffered "significant paranoia (psychotic episode)"
immediately after undergoing shoulder surgery in August 2009.
(Defs.' Stmt. ¶ 9; see also Letter of Rowles, dated Apr. 21, 2010,
attached as part of Group Ex. N to Defs.' Stmt., at 1.)  Rowles
"recommended a work restriction of desk duty and midnight shift"
because the "symptoms have not fully resolved." (See Defs.' Stmt.
¶ 9.)  At that point, Sneed had been on medical leave for a full
year.  According to the defendants, Sneed remained on paid medical
leave because there were no midnight-shift, light-duty assignments
available at that time. (Id.)  In an affidavit attached to his
response, Sneed contends that he observed two police officers with
light duty assignments — Henry Harris and Richard Jones — working
in the HPD's radio room in addition to two regularly assigned
radio-room operators. (See Sneed Aff., attached as Ex. Section 9

---

[7] Although the parties do not discuss the origins of Sneed's PTSD in
their Rule 56.1 statements, Sneed apparently claims that it stems from his
involvement in multiple on-duty incidents involving gun fire. (See Op. and
Award, In the matter of Arbitration between City of Harvey and Illinois Council
of Police, attached as Ex. H to Defs.' Stmt., at 7 n.27.)

[8] Counsel for the defendants provided a copy of Sneed's April 2010 EEOC
charge after the court notified him that it had been omitted from group exhibit
N.

- 6 -

to Pl.'s Resp. to Defs.' Stmt., ¶ 2.)  According to Sneed, he observed these officers at some unspecified time between May 2007 and October 2011.  (Id.)  He does not provide any other context for his observations.

On April 23, 2010, while still on paid medical leave, Sneed followed Eaves with a video camera to a bowling alley in Dolton, Illinois.  (Defs.' Stmt. ¶ 10.)  After Eaves drove away from the bowling alley Sneed called the Dolton police, claiming that Eaves was intoxicated.  (Id.)  Eaves was detained by a Dolton police officer, escorted to the Dolton police station, and then released without being charged.  (Id.)  As he exited the station, Eaves saw Sneed standing outside.  (Id.)  Eaves admits calling Sneed a "psycho" after learning that it was Sneed who had called the police.  (Id.)  The defendants have included in their summary judgment materials a memorandum that Sneed addressed to the HPD's Internal Affairs Department ("IAD") describing the Dolton incident and requesting an investigation.  (See Memo, dated Apr. 30, 2010, attached as part of Group Ex. 1 to Aff. of Bettie Lewis ("Lewis Aff."), attached as Ex. G to Defs.' Stmt.)  Sneed asked that the investigation remain confidential because he feared retaliation "by Chief Eaves . . . or someone acting under his authority."  (Id.)  Sneed contends that in June 2010 an individual identified as Detective Escalante refused to let him into police headquarters to pick up his check stub.  (See Defs.' Stmt. ¶ 36; see also Sneed

- 7 -

Dep. at 225-29.) He alleges that defendant Marcus Patterson did not allow him to file a sworn complaint against Escalante in retaliation for the Dolton incident. (See Defs.' Stmt. ¶ 36.) Around this same time Sneed contacted the City of Harvey's corporation counsel, defendant Bettie Lewis, to complain about misconduct by Eaves and other Harvey police officers. (Id. at ¶ 11; see also Aff. of Bettie Lewis ("Lewis Aff."), attached as Ex. G to Defs.' Stmt., at Group Ex. 1 (correspondence indicating that Sneed complained about Eaves to Lewis sometime before August 2010.).) In response to Sneed's allegations, Lewis retained outside counsel to investigate. (See Defs.' Stmt. ¶ 12.)[9] Citing correspondence between the City's outside counsel and Sneed's attorney, the defendants contend that Sneed refused to cooperate with the investigation. (See id. at ¶¶ 11-12.) The correspondence indicates that someone (presumably Sneed) had given the City "various photographs depicting a number of compact discs (CDs) purporting to obtain [sic] surveillance of various persons employed by the City." (See Letter from J. Wilson to P. Walsh, dated Aug. 9, 2010, attached as part of Group Ex. 1 to Lewis Aff.), attached as Ex. G to Defs.' Stmt.) The City's attorney asked Sneed's attorney for unedited copies of the "surveillance material." (Id.) It is apparent from the materials that the defendants have filed

---

2/ The defendants contend that outside counsel independently investigated Sneed's claims. (See Defs.' Stmt. ¶ 12.) Sneed believes that the attorney that the City retained was not truly independent. (See Pl.'s Resp. to Defs.' Stmt. ¶ 12.) The parties' dispute is not material to Sneed's claims in this case.

- 8 -

that we do not have all the relevant correspondence between the parties. From the letters that they have provided, we understand that Sneed's attorney was retained primarily (and perhaps exclusively) to represent Sneed in connection with claims arising from the Dolton incident. (See Letter from J. Wilson to P. Walsh, dated Aug. 18, 2010, attached as part of Group Ex. 1 to Lewis Aff.; Letter from P. Walsh to J. Wilson, dated Aug. 22, 2010, attached as part of Group Ex. 1 to Lewis Aff.) And he viewed counsel's demands for "surveillance material" to be beyond the legitimate scope of an investigation of Eaves's conduct. (See Letter from P. Walsh to J. Wilson, dated Aug. 22, 2010, at 1 ("Our dealings began under the auspice of an investigation of Denard Eaves commissioned by the City of Harvey but has devolved into an investigation of my client.").) The City's outside counsel reported to Lewis that he was closing the investigation as "inconclusive," citing Sneed's attorney's failure to provide the requested surveillance materials. (See Letter from J. Wilson to B. Lewis, dated Sept. 27, 2010, attached as part of Group Ex. 1 to Lewis Aff.)

On September 3, 2010, Sneed filed another charge with the EEOC renewing his failure-to-accommodate allegation and claiming that he had been denied his uniform allowance and a union-negotiated pay raise in retaliation for his previous charge. (See Defs.' Stmt. ¶ 28.) On December 6, 2010, Sneed sued the City of Harvey alleging that he had been unfairly passed over for promotion in favor of less qualified candidates. (See id.; see also Compl., Sneed v.

City of Harvey, No. 20106004271 (Cir. Ct. Ill.), attached as part of Group Ex. J to Defs.' Stmt.)  Sneed contends that in January 2011 he reported to the IAD that HPD officers were improperly performing, and receiving compensation for, multiple jobs simultaneously.  (See Pl.'s Resp. to Defs.' Mem. ¶ 11.)  He cites a memorandum addressed to "Chief Denard Eaves/Internal Affairs Division" in which he accused unidentified "Harvey Police Officials" of working security details for area schools during times when they were supposed to be working for the department. (See Memo addressed to Eaves/IAD, dated Jan. 21, 2011, attached as part of Section 11 (Group Ex.) to Pl.'s Resp. to Defs.' Stmt.)  He also cites time records that he obtained in discovery in this case that he says support his claim that one officer — Roy Wells — purported to work in multiple locations simultaneously.  (See Time Records, attached as part of Section 11 (Group Exhibit) to Pl.'s Resp. to Defs.' Stmt.)[10]

Sneed returned to active duty in March 2011.  (See Defs.' Stmt. ¶ 13.)  He was assigned to HPD's Patrol Division and asked to work with another officer to become familiar with his new responsibilities.  (See id.)  Defendant Lavandus Kirkwood was assigned to help Sneed, but his orientation ended after one day because he accused Kirkwood of violating the officers' collective

---

[10]/ Sneed's unverified complaint — which he also cites — cannot be used to defeat summary judgment.  See Sparing v. Village of Olympia Fields, 266 F.3d 684, 692 (7th Cir. 2001) ("At summary judgment, Sparing had an obligation to come forward with evidence to support his claim and could not merely rest on the allegations in his complaint.").

bargaining agreement ("CBA"). (Id.) The CBA provides that, before
being required to submit to a performance evaluation, the officer
must be given the opportunity to meet with an "appropriate
supervisor" and to inspect the evaluation document. (See CBA,
attached as part of Section 13 to Pl.'s Resp. to Defs.' Stmt., §
7.3.) The defendants admit that Kirkwood filled out evaluation
forms during Sneed's "orientation," but they contend that he did so
only because those forms provide a basic outline of patrol matters.
(See Defs.' Stmt. ¶ 13.) Sneed contends that Kirkwood held himself
out to be Sneed's "Field Training Officer" ("FTO"); the defendants
contend — without dispute — that he was not Sneed's FTO. (See id.)
The significance of the "FTO" designation is unclear, but it is
undisputed that Kirkwood's ratings did not affect Sneed's
employment status. (Id.)

On March 30, 2011, Sneed's attorney filed a lawsuit on his
behalf against Eaves and others alleging constitutional violations
stemming from the Dolton incident. (See Defs.' Stmt. ¶ 11); see
also Sneed v. Fox, Case No. 11-CV-1923 (N.D. Ill.). Shortly
thereafter, Sneed complained that he was receiving death threats at
his home, which he believed were instigated by Eaves in retaliation
for the Dolton incident. (Defs.' Stmt. ¶ 14; see also Internal
Memo from Sneed to Eaves, dated Mar. 29, 2011, attached as part of
Group Ex. N to Defs.' Stmt.) In a series of memoranda addressed to
individuals within and outside the HPD (including the Mayor of

Harvey, defendant Eric Kellogg), Sneed accused Eaves of corruption
and incompetence and demanded to be transferred outside department
headquarters for his protection. (See generally Group Ex. N to
Defs.' Stmt. (containing seven such memoranda dated between March
28, 2011 and April 11, 2011); see also Memo re "Request for
Protection," dated Mar. 28, 2011, at 2 ("I am in fear of my life
and in fear of being the victim of some internal plot by Chief
Eaves and Conspirators to either harm me or terminate me.").)[11]
Sneed contends that in response to one such memorandum, defendant
officer Cameron Forbes ordered Sneed to accompany him to the HPD's
Roll Call Room to meet with Commander Roy Wells. (Defs.' Stmt. ¶
15; see also Memo from Sneed to Forbes and Eaves, dated Apr. 2,
2011, attached as part of Group Ex. N to Defs.' Stmt.) Sneed
claims that he was "unlawfully confined" to the room when he
attempted to leave to call his union representative. (Defs.' Stmt.
¶ 15.) When Wells arrived, he told Sneed that he was not confined
to the Roll Call Room and that Wells would speak with him
"momentarily." (Id. at ¶ 16; see also Internal Memo, dated Apr. 2,
2011, attached as part of Group Ex. N to Defs.' Stmt. (report
authored by Sneed stating that Wells told him "he was not confined
to the squad room nor did [he] have to remain in the squad room and
to allow Commander Wells a few minutes to get dressed and he would

---

[11] The parties have not cited evidence indicating when (or even if) the
defendants received these memoranda. For purposes of this opinion, we will
assume that the defendants received Sneed's memoranda on or around the dates
indicated therein.

speak with [Sneed] momentarily") (all caps removed).)  Sneed later
submitted a FOIA request for any video footage that the security
camera in the Roll Call Room may have captured to prove his claim
that he was wrongfully detained.  (Defs.' Stmt. ¶ 16.)
Approximately a week after this incident in the Roll Call Room,
Sneed complained that Eaves and other HPD officers gave
preferential treatment to a well-connected person that Sneed had
arrested for a minor traffic violation.  (See Memo from Sneed to
Eaves, Lewis, Kellogg, and IAD, dated Apr. 11, 2011, attached as
part of Group Ex. N to Defs.' Stmt., at 1 (accusing Eaves and
another officer of nepotism and corruption).)  Sneed stated that he
believe that the incident was "another retaliatory act."  (Id. at
2.)

On May 23, 2011, Sneed received a response to his FOIA request
informing him that there was no footage available "due to
inoperable equipment."  (Defs.' Stmt. ¶ 17.)  Two days later, on
May 25, 2011, Sneed went to Forbes's office immediately adjacent to
the Roll Call Room.  (Id. at ¶ 17.)  He gave Forbes a union
grievance form, which Forbes accepted.  (Id.)  But Forbes refused
to sign a receipt acknowledging that he had received the grievance.
(Id.)[12]  Sneed then walked to the adjacent office occupied by
Sergeant John Rizzi and, standing two or three feet from the

---

[12]/ The defendants contend that Sneed had prepared the receipt himself.
(See Defs.' Stmt. ¶ 18.)  Sneed contends that the receipt is part of the standard
grievance form.  (See Pl.'s Resp. to Defs.' Stmt. ¶ 18.)

threshold of the office, asked Rizzi to act as Sneed's witness that Forbes would not sign the receipt. (Id.) Meanwhile, Forbes exited his office, passed Sneed without touching him, entered Rizzi's office, and then closed the door behind him. (Id.) A videotape of the incident shows that Sneed stepped forward across the threshold with his right arm held out, possibly to stop the door from closing. (See Surveillance Video, attached as Ex. M to Defs.' Stmt., at approx. 3:14 p.m. to 3:15 p.m.)[13] Sneed then makes a move to walk away as the door closes behind him, not touching any part of his body. (Id.) He collects his belongings and leaves the Roll Call Room without displaying any visible signs of pain or distress. (Id.) Sneed drafted a memorandum that same day addressed to Sergeant Kevin Ramsey describing the incident:

> Commander Forbes angrily and very very forcefully shoved to [sic] door at [Sneed] intentionally attempting to strike [Sneed] with it. [Sneed] was able to put his hands, arms, and body in a position to stop the door from striking [him] in his facial area. Commander Forbes after realizing [Sneed] had blocked the door then without provocation stormed back to the door from within Sgt. Rizzi's office and for the second time violently hurled the door in [Sneed's] direction and [he] was able to miss getting hit by the door as it slammed extremely loud and violently shaking the entire frame of the door . . . . [Sneed] then sought medical treatment at both the McGrath Clinic and Ingalls Hospital Emergency room for soreness in surgically repaired left shoulder. [Sneed] was advised that it is common to feel pain and soreness the next day by taking the direct force of the door in hands, arms, and shoulders in an effort to stop from being hit by it. [Sneed will] pursue criminal charges against Commander

_____

[13]/ The videotape does not show whether or not Sneed made contact with the door as he reached across the threshold.

- 14 -

Forbes for intentionally striking him with the door and attempting to do it again.

(See Internal Memo, dated May 25, 2011, attached as Employer's Ex. 1 to Trans. of Arbitration Proceedings ("Arb. Trans."), dated Sept. 14, 2013, attached as Ex. D to Defs.' Stmt.; see also "Employee/Supervisor First Report of Injury," dated May 25, 2011, attached as Ex. 4 to Arb. Trans. (stating that Forbes "attempted to slam office door on me injuring surgically repaired shoulder").) Sneed later filed a police incident report accusing Forbes of battery in which he claimed that he put "both of his hands up to stop the door, as it began to close." (See Harvey Police Persons Incident Report, attached as Ex. 2 to Arb. Trans.) He also filed a worker's compensation claim stating that a "door was slammed shut onto Petitioner's outstretched arms." (See Worker's Compensation App., dated June 1, 2011, attached as Ex. 3 to Arb. Trans., at 1.)

The IAD opened an investigation of Sneed's allegations and assigned Kirkwood to conduct it. (See Defs.' Stmt. ¶ 21.) Sneed rebuffed Kirkwood's attempts to interview him because (1) Sneed wanted an attorney present; and (2) his thinking was impaired by prescription medication. (See id.; see also Pl.'s Resp. to Defs.' Stmt. ¶ 21.) Based on the videotape, Kirkwood concluded that Sneed had lied about the incident in his various reports and the HPD scheduled a hearing to determine whether Sneed should be terminated. (See Defs.' Stmt. ¶ 23.) Three days before the scheduled hearing, Sneed sent a letter to Lewis accusing her of

- 15 -

numerous legal and ethical violations and accusing Kirkwood of
bias. (See Letter from Sneed to Lewis, dated Sept. 19, 2011,
attached as Ex. 2 to Lewis Aff.) On September 21, 2011 — the day
before the scheduled hearing — Sneed filed an emergency motion in
this court alleging several procedural defects. (See Emergency
TRO, Dkt. 1.) We denied Sneed's request to enjoin the hearing,
(see Minute Entry, dated Sept. 22, 2011, Dkt. 9), although it was
apparently rescheduled to October 10, 2011. (See Defs.' Stmt. ¶
24.) The hearing resulted in Sneed's termination on the stated
ground that he had falsified reports about his confrontation with
Forbes. (See id.) An arbitrator later upheld that decision,
concluding that "Sneed's reports and allegations against Commander
Forbes and his filing of workers' compensation contain such
inaccurate and incorrect versions of what occurred, that, at a
minimum, [his] conduct certainly amounted to unbecoming conduct in
violation of the City's rule." (Op. and Award, In the matter of
Arbitration between City of Harvey and Illinois Council of Police,
at 11.)

Sneed's ten-count complaint alleges: (1) failure-to-
accommodate and retaliation in violation of the Americans With
Disabilities Act ("ADA") (Count I); (2) a § 1983 claim based upon
the same conduct underlying Sneed's ADA claim (Count II); (3) a
Monell claim based upon an alleged practice of discriminating
against disabled police officers (Count III); (4) First Amendment

- 16 -

retaliation (Count IV); (5) state-law retaliatory discharge (Count V); (6) a § 1985 claim alleging a conspiracy to deny Sneed equal protection (Count VI); (7) a § 1983 claim alleging retaliatory discharge (Count VII); (8) "Neglect to Prevent Civil Rights Violation" (Count VIII); (9) assault and battery (Count IX); and (10) indemnification (Count X). The defendants have moved for summary judgment on all of Sneed's claims.[14]

## DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for

---

[14]/ On April 30, 2013, Sneed filed a motion to compel certain discovery responses without noticing the motion for hearing. The defendants responded to the motion with a memorandum indicating that they had provided everything that Sneed sought in his motion. When we heard the defendants' motion for summary judgment on June 5, 2013, Sneed did not mention his motion to compel or the defendants' response. Accordingly, Sneed's motion to compel [80] is denied as moot.

the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).[15]

**B.  Sneed's ADA Claims**

**1.  Failure to Accommodate (Count I)**

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). "In order to establish a prima facie case of failure to accommodate under the ADA, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." <u>Cloe v. City of Indianapolis</u>, 712 F.3d 1171, 1176 (7th Cir. 2013) (citation and internal quotation marks omitted).[16]

---

[15]/  The defendants served Sneed with a plain-language summary of these requirements pursuant to Local Rule 56.2 ("Notice to Pro Se Litigants Opposing Summary Judgment").

[16]/  We will assume for purposes of this discussion that Sneed's PTSD rendered him "disabled" as the ADA defines that term.

- 18 -

"An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee." <u>Gile v. United Airlines, Inc.</u>, 95 F.3d 492, 499 (7th Cir. 1996). Sneed's psychiatrist "recommended a work restriction of desk duty and midnight shift" because Sneed was still exhibiting paranoia after the "psychotic episode" he experienced after shoulder surgery. It is undisputed that only one position satisfied those two criteria: a late-night shift in the HPD's Radio Room. (<u>See</u> Defs.' Stmt. ¶ 59.) Steven Porter, the individual responsible for making light-duty assignments in 2010, states that the Radio Room was fully-staffed at that time. (<u>See</u> Porter Aff., attached as Ex. I to Defs.' Stmt.) Sneed concedes that the Radio Room is operated by two "regularly assigned" dispatchers, but states that he saw *additional* officers working in the Radio Room at some point between May 2007 and October 2011. (<u>See</u> Sneed Aff. ¶ 2.)[17] Sneed's assertion — which we accept as true for purposes of the defendants' motion — suggests a possible avenue for investigation, but

_____

[17] The defendants contend that Sneed's affidavit contradicts his deposition testimony. (<u>See</u> Defs.' Reply at 13-14.) The defendants' attorney asked Sneed if he knew whether *defendant Patterson* had approved any light-duty assignments. (<u>See</u> Sneed Dep. at 223-224.) Sneed said "no." (<u>Id.</u> at 225.) The fact that Sneed could not identify any instance where Patterson approved an accommodation does not contradict his testimony that on two occasions he saw more than two officers working in the Radio Room.

discovery has closed.  By itself, this evidence is too vague and
general to create a material dispute of fact.  We do not know
anything about the circumstances surrounding those assignments.
Sneed devotes only one paragraph of his response brief to his
failure-to-accommodate claim and does not cite any relevant legal
authorities. (<u>See</u> Pl.'s Resp. at 12.)  We conclude that the
defendants are entitled to summary judgment on Sneed's reasonable-
accommodation claim.

## 2.   ADA Discrimination & Retaliation (Count I)

The ADA protects disabled plaintiffs from discrimination and
from retaliation for asserting their ADA rights.  <u>Dickerson v.
Board of Trustees of Community College Dist. No. 522</u>, 657 F.3d 595,
600-01 (7th Cir. 2011).  A disabled plaintiff — and we will again
assume that Sneed was disabled within the meaning of the ADA — can
prove disability discrimination and retaliation using either a
direct or indirect method of proof.  <u>Id.</u>  Under the direct method,
the plaintiff must offer evidence that his or her disability, or
protected ADA activity, caused an adverse employment action.  <u>Id.</u>
at 601.  Under the indirect method, the plaintiff must "establish
a prima facie case of discrimination by showing that (1) he is
disabled under the ADA [or in the case of retaliation, engaged in
protected ADA activity]; (2) he was meeting his employer's
legitimate employment expectations; (3) he suffered an adverse
employment action; and (4) similarly situated employees without a

- 20 -

disability were treated more favorably." Id. at 601-02.[18] The
burden then shifts to the defendant to articulate a legitimate,
non-discriminatory (or non-retaliatory) reason for the adverse
action. See id. at 601  If the defendant meets this burden, the
plaintiff must then demonstrate that the defendant's proffered
reason was pretextual. See id.

Sneed cites a litany of employment actions that he believes
were discriminatory and/or retaliatory. In an effort to pare down
his claims, we will first determine which of those actions can
support a claim for discrimination and/or retaliation.

**a. Whether Sneed Suffered Actionable Adverse Employment Actions.**

"An adverse employment action must be 'materially' adverse to
be actionable, meaning more than a mere inconvenience or an
alteration of job responsibilities." Kersting v. Wal-Mart Stores,
Inc., 250 F.3d 1109, 1115 (7th Cir. 2001) (citations and internal
quotation marks omitted).  Sneed contends that while he was on
medical leave defendant Sandra Alvarado denied him a uniform
allowance, denied him a union-negotiated pay raise, and somehow
interfered with one payroll direct deposit. (See Defs.' Stmt. of
Facts ¶ 30.)  Sneed admits that these issues were corrected once
they were brought to Alvarado's attention. (See Pl.'s Resp. to
Defs.' Stmt. ¶ 30; see also Alvarado Aff., attached as Ex. F to

---

[18]/  We will again assume that Sneed is disabled. (See supra n. 14.)

Defs.' Stmt., ¶ 3.)  He also contends that Alvarado prevented him from participating in a department-wide survey intended to measure officer morale. (<u>See</u> Defs.' Stmt. ¶ 30.)  Alvarado states that in June 2010 she distributed the surveys to officers during the first and second shifts only — Sneed was on medical leave at that time. (<u>See</u> Alavarado Aff. ¶ 4.)  Furthermore, the survey was abandoned after HPD officers released a petition stating that they had no confidence in Eaves.  (<u>See</u> <u>id.</u> ("Due to the petition, it was determined that completing the survey would be an exercise in futility.").)  Sneed quibbles with Alvarado's affidavit.  (<u>See</u> Pl.'s Resp. to Defs.' Stmt. ¶ 62.)  But Sneed's inability to participate in an abandoned survey on officer morale is trivial. <u>See</u> <u>Kersting</u>, 240 F.3d at 1115 ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an ... employee did not like would form the basis of a discrimination suit.") (citation and internal quotation marks omitted).  Similarly, Kirkwood's March 2011 evaluation is not actionable because it is undisputed that it did not result in any "tangible job consequence."  <u>Id.</u> at 1118 (statements warning the plaintiff not to discuss his discrimination claim at work were not actionable).  The same goes for Sneed's claim that Eaves undermined a motorist arrest that Sneed made in April 2011. (<u>See</u> Defs.' Stmt. ¶ 31.)

- 22 -

Sneed also contends that Eaves denied him promotion to detective in 2009 and 2010. (See id.) This is a "tangible job consequence," but Sneed's claim is procedurally barred. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 2007); see also 42 U.S.C. 12117(a) (ADA provision incorporating Title VII's exhaustion requirement). The test for determining whether an EEOC charge encompasses the claims in a complaint is liberal: "all Title VII [and ADA] claims set forth in a complaint are cognizable that are like or reasonably related to the allegations of the charge and growing out of such allegations." Id. But "the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Id. at 501. Sneed's April 2010 charge was based solely on his claim that he did not receive a reasonable accommodation. His September 2010 EEOC charge implicated Eaves, but it did not mention or allude to being passed over for promotion to detective. Cf. id. at 502 (EEOC claim alleging that the plaintiff was required to pay certain insurance premiums, and male colleagues were not, did not encompass a claim for discriminatory sales-route assignments). Even if the claim was not barred, we agree with the defendants that there is no evidence supporting Sneed's allegation that he was not promoted for a discriminatory or retaliatory reason. Sneed spent virtually all

of 2009 and 2010 on medical leave. He has not suggested any reason to believe that he was entitled to a promotion despite not performing any work during the relevant time period, or cited evidence that any similarly situated employee was promoted to detective.

The defendants also argue that any claim based upon Sneed's termination is untimely. At a hearing before this court on June 6, 2012, defense counsel pointed out that Sneed had a pending EEOC charge stemming from his termination. (See Trans. of Proceedings, dated June 6, 2012, attached as Ex. L to Defs.' Stmt., at 22-24.) Counsel suggested that Sneed request a right-to-sue notice so that he could challenge his termination in this lawsuit. (Id.) The parties appear to agree that Sneed received a right-to-sue notice on August 16, 2012. (See Defs.' Mem. at 13-14; Pl.'s Resp. at 10; Defs.' Reply at 3.) The defendants contend that Sneed's failure to amend his complaint within 90 days after receiving the notice bars his ADA claim for wrongful termination. (See Defs.' Mem. at 13-14); see also 42 U.S.C.A. § 2000e-5(f)(1). Sneed's amended complaint does challenge his termination, but on First Amendment (not disability discrimination or ADA-retaliation) grounds. (See Am. Compl. ¶¶ 127-139.) Neither party has cited a case with similar facts, nor has either side thoroughly analyzed the issue. Under the circumstances, we decline to dismiss Sneed's claim as untimely.

**b.    Whether Sneed's Termination Was Discriminatory or Retaliatory**

Sneed has not clearly indicated what method of proof — direct or indirect — he has elected.  So, we will analyze his claims under both methods.

*(1)    Direct Method.*

Sneed can establish a causal link between his disability and/or his EEOC charges and his termination using either direct or circumstantial evidence.  See Dickerson, 657 F.3d at 601.  "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus."  Id.  Sneed has not cited any direct evidence supporting his claim.  "The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."  Dickerson, 657 F.3d at 601.  Sneed filed his September 2010 EEOC charge approximately seven months before the IAD began its investigation, and the investigation was initiated *at Sneed's request*.  So, there is nothing suspicious about the timing of the investigation or his termination.  Sneed has not cited, nor are we aware of, any "ambiguous statements or behavior" that might lead a

jury to reasonably question the defendants' real motives. Eaves admits that he called Sneed a "psycho" in April 2010, but he made this stray comment more than a year before the investigation into the Forbes incident. See Petts v. Rockledge Furniture, LLC, 534 F.3d 715, 722 (7th Cir. 2008) ("[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.") (citation and internal quotation marks omitted). Sneed argues that "numerous" similarly situated employees received more favorable treatment. (Pl.'s Resp. at 11.) He specifically identifies — albeit obliquely — only two: Eaves and Kirkwood. (Id.) According to Sneed, Eaves is a similarly situated employee because he drove his car while intoxicated in April 2010. There is no evidence that Eaves was ever charged with drunk driving, much less convicted. And even if he had been convicted, Sneed's on-duty misconduct and abuse of the HPD's grievance process is not substantially similar to an instance of off-duty misconduct. See Crawford v. Indiana Harbor Belt R. Co., 461 F.3d 844, 846 (7th Cir. 2006) ("[M]embers of the comparison group must be comparable to the plaintiff in all *material* respects . . . .") (emphasis in original). Sneed accuses Kirkwood of "lying to [a] Cook County Circuit Judge . . . ." (Pl.'s Resp. at 11.) This appears to refer to Sneed's allegation that Kirkwood committed perjury in his divorce proceeding. (See Am. Compl. ¶ 78; see also

Sneed Dep. at 157-60 (stating his belief that court records show that Kirkwood falsely stated in their divorce proceeding that he did not know his wife's whereabouts).) First, Sneed has not cited any admissible evidence substantiating his claim about Kirkwood's conduct. Second, like his accusations against Eaves, Kirkwood's alleged perjury in his divorce proceeding is not substantially similar to Sneed's demonstrably false accusations of battery against a fellow police officer.

We reject Sneed's argument that the stated reasons for the investigation culminating in his termination were pretextual. (See Pl.'s Resp. at 11.) "Pretext means a dishonest explanation, a lie rather than an oddity or an error." Bodenstab v. County of Cook, 569 F.3d 651, 657 (7th Cir. 2009). To establish pretext, Sneed must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [defendants'] asserted reason that a reasonable person could find [it] unworthy of credence." Coleman v. Donahoe, 667 F.3d 835, 853 (7th Cir. 2012) (citation and internal quotation marks omitted). Sneed quibbles with the defendants' assertion that he was "never struck by the door." (See Pl.'s Resp. to Defs.' Stmt. ¶ 23.) Although the door is not visible at first in the videotape, (see supra n. 13), one could infer that Sneed touched it with the outstretched fingers of his right hand to prevent it from closing. But Forbes clearly did not slam the door "on" Sneed. (Cf. Internal Memo, dated May 25, 2011

("Commander Forbes angrily and very very forcefully shoved to [sic] door at [Sneed] intentionally attempting to strike [Sneed] with it. [Sneed] was able to put his hands, arms, and body in a position to stop the door from striking [him] in his facial area.).) The ease with which Sneed appears to stop the door (if that is what he did), and the fact that he displays no physical discomfort immediately after the event, is inconsistent with his allegation that the door was not "very, very forcefully shoved." And in any event, Sneed caused whatever minor physical contact there may have been — he stepped forward and reached out across the threshold. Sneed filed a false police report accusing a fellow police officer of battery, and then attempted to obtain worker's compensation for injuries allegedly caused by the phantom attack. Sneed contends that Forbes and Rizzi gave inconsistent accounts of what happened,[19] but those inconsistencies are immaterial. The videotape clearly contradicts Sneed's version of events and proves that his reports were false. Sneed argues that HPD's failure to obtain a videotape expert shows that his pre-termination hearing was a sham. At most this fact might suggest that the defendants had made an error, not that they

---

[19]/ Sneed points out that Rizzi told Kirkwood during his investigation that Forbes attempted to close the door twice. (See Pl.'s Resp. to Defs.' Stmt. ¶ 55; see also Audio Recording of Rizzi Interview, filed with the court on April 23, 2013 (Dkt. 96).) At the arbitration hearing Rizzi testified that Forbes shut the door only once. (See Arb. Trans. at 43-44, 55-56.) Rizzi may have changed his testimony to corroborate Forbes, who consistently maintained that he closed the door only once. (See id. at 17.) The arbitrator's failure to address the inconsistency is puzzling (Sneed speculates that the arbitrator did not review the recordings of Rizzi's and Forbes's interviews). But Rizzi's and Forbes's credibility on the number of times the door was closed is irrelevant to the question of whether Sneed lied about the occurrence.

lied about the true reasons for Sneed's termination.  Cf. Bodenstab, 569 F.3d at 657.  In any event, Sneed has not explained why he thinks the videotape is unreliable or requires expert examination.  Sneed also argues that the defendants "could not have honestly believed [he] fabricated his account of the incident when the medical professional determined he was indeed injured." (Pl.'s Resp. at 11.)  Even assuming that Sneed was injured on May 25, 2010, the video shows that he deliberately put himself in harm's way.  The stated basis for Sneed's termination is plausible and consistent in all material respects.

> (2) Indirect Method

The defendants also contend that Sneed cannot establish a prima facie case of retaliation because he was not meeting his employer's legitimate employment expectations.  This element overlaps with the issue of pretext,[20] and as we just discussed, a jury could not reasonably conclude that the stated reason for Sneed's termination was pretextual.  Nor has Sneed cited evidence that similarly situated employees were treated more favorably. (See supra.)  So, Sneed's ADA discrimination and retaliation claims fail under the indirect method as well.

---

[20] See Everroad v. Scott Truck Systems, Inc., 604 F.3d 471, 477 (7th Cir. 2010) ("In some cases . . . the issue of satisfactory performance and the question of pretext overlap."); Bodenstab, 569 F.3d at 657 ("While the question of pretext arises only after a plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we can skip over the initial burden-shifting of the indirect method and focus on the question of pretext.").

- 29 -

### 3. Sneed's § 1983 Claim "Via" the ADA (Count II) and <u>Monell</u> Claim (Count III)

In Count II, Sneed seeks damages under § 1983 for the City of Harvey's alleged "custom, policy and practice [of] discriminat[ing] against police officers with disabilities and those that filed charges with the EEOC." (Am. Compl. ¶ 111.) He has also filed a separate claim, expressly based on <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658 (1978), alleging the same custom, policy, and practice (Count III). (<u>See</u> <u>id.</u> at ¶ 114.)[21] It appears that most courts in this district have held that a plaintiff cannot recover damages under § 1983 for ADA violations. <u>See</u> <u>Torrence v. Advanced Home Care, Inc.</u>, No. 08-CV-2821, 2009 WL 1444448, *7-8 (N.D. Ill. May 21, 2009) (collecting cases). We need not reach that issue because Sneed has not shown that any of the individual defendants, or anyone else affiliated with the City of Harvey, violated his rights under the ADA. (<u>See</u> <u>supra</u>.) So, there is no basis to impose municipal liability even assuming that ADA violations can support a § 1983 claim. <u>See, e.g.</u>, <u>Sallenger v. City of Springfield, Ill.</u>, 630 F.3d 499, 505 (7th Cir. 2010) ("[B]ecause there is no underlying constitutional violation, the City cannot be liable under <u>Monell</u>."). The City of Harvey is entitled to summary judgment on Counts II and III of Sneed's amended complaint.

---

[21]/ The distinction between these two claims is unclear.

- 30 -

## C.  First Amendment Retaliation (Count IV)

In order to be found liable for a constitutional violation under § 1983, the plaintiff must show that the defendant caused or participated in the violation.  Sheik-Abdi v. McClellan, 37 F.3d 1240, 1248 (7th Cir. 1994) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.").  Sneed has sued Kellogg because, as the Mayor of Harvey, he must have approved or allowed the constitutional violations that Sneed alleges.  (See Defs.' Stmt. ¶ 33.)  He accuses Bettie Lewis of influencing Eaves's decision to place Sneed on administrative leave in 2008 and to fire him in 2011.  But he does not cite any evidence of her participation beyond the fact that she was corporation counsel, therefore she must have participated in Eaves's actions.  These contentions are insufficient to support § 1983 liability.  We conclude that Kellogg and Lewis are entitled to summary judgment on Sneed's First Amendment retaliation claim.

With respect to the other defendants, there is at least some evidence (sometimes tenuous) that they participated in some action that Sneed considers retaliatory.  To prevail on his First Amendment retaliation claims against any of these defendants, Sneed must show that: "(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3)

his speech was at least a motivating factor in the employer's actions." <u>Kidwell v. Eisenhauer</u>, 679 F.3d 957, 964 (7th Cir. 2012). As a threshold matter, we can eliminate any claims based on of retaliation that occurred more than two years before Sneed filed his original complaint on November 28, 2011. <u>See Licari v. City of Chicago</u>, 298 F.3d 664, 667-68 (7th Cir. 2002) ("A two year statute of limitations applies to section 1983 claims in Illinois.").[22]

### 1. Constitutionally Protected Speech

We apply a two-part test to determine whether a public employee's speech is protected. <u>See Spiegla v. Hull</u>, 481 F.3d 961, 965 (7th Cir. 2007). First, we ask whether the employee "spoke as a citizen on a matter of public concern." <u>Id.</u> (citation and internal quotation marks omitted). If so, we go on to balance the employee's interest in speaking against the employer's interest "in promoting effective and efficient public service." <u>Id.</u>

### a. Whether Sneed Spoke as a Citizen

The defendants argue that Sneed engaged in at least some of his allegedly protected speech as an employee, not as a citizen. (<u>See</u> Defs.' Mem. at 21-23.) In <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), a deputy district attorney challenged the accuracy of an affidavit used to obtain a search warrant. <u>Id.</u> at 414. He told his supervisors about his concerns and recommended that they

---

[22]/ This includes any claim based upon Sneed's administrative leave in December 2008.

- 32 -

dismiss the underlying criminal case. Id. The plaintiff's
statements upset his superiors and allegedly led to a series of
retaliatory employment actions. Id. at 414-15. The Supreme Court
concluded that the plaintiff's complaints to his supervisors were
not entitled to First Amendment protection because he made them
pursuant to his official duties as a prosecutor. Id. at 421. In
other words, he was speaking as an employee, not as a citizen. Id.
"Garcetti requires a practical inquiry into whether an employee's
expression was made pursuant to her official obligations, including
both her day-to-day duties and her more general responsibilities."
Trigillo v. Snyder, 547 F.3d 826, 829 (7th Cir. 2008). The
plaintiff in Garcetti "spoke as a prosecutor fulfilling a
responsibility to advise his supervisor about how best to proceed
with a pending case." Garcetti, 547 U.S. at 421. Similarly, the
plaintiff in Spiegla spoke as an employee "when she reported []
possible misconduct to her superior and sought clarification of a
security policy she felt may have been breached." See Spiegla, 481
F.3d at 967; see also Wackett v. City of Beaver Dam, Wis., 642 F.3d
578, 581-82 (7th Cir. 2011) (agency supervisor spoke in an official
capacity at agency board meetings); Ogden v. Atterholt, 606 F.3d
355, 358-60 (7th Cir. 2010) (employee was acting in an official
capacity when he drafted an internal memorandum formally requesting
that his supervisor reorganize his department).

- 33 -

Some of Sneed's speech clearly fell outside the scope of his official duties. Sneed was not acting as a police officer when he filed lawsuits and EEOC complaints against the city. Also, we think it is apparent that Sneed was acting as a citizen when he notified individuals outside the HPD of alleged corruption within the department. For example, Sneed's March 28, 2011 memorandum accusing Eaves of corruption has a long list of purported recipients, including Mayor Kellogg, Corporation Counsel Bettie Lewis, "Deputy Attorney General for Criminal Justice" Mike Hood, and "States Attorney Office of Special Prosecutions" ASA Lynn McCarthy. (See Memo addressed to Kellogg et al., dated Mar. 28, 2011, attached as part of Group Ex. N to Defs.'s Stmt.) The memorandum purports to attach "approximately 50 pages of documents that were made available to [Sneed] from an anonymous unknown source that [he was] turning over to the City of Harvey [illustrating] past practices of unlawful behavior and disciplinary history of the highest ranking person with the Harvey Police Department [Eaves]." (Id.)[23] He also claimed to be "aware of some alleged extrinsic fraud committed by Eaves in lawsuits in which he was deposed under oath." (Id.) Sneed's April 11, 2011 memorandum accusing Eaves of "nepotism" and "corruption" is similar. (See Memo from Sneed to Eaves, Lewis, Kellogg, and IAD, dated Apr. 11,

---

[23]/ The copy of Sneed's memorandum that the parties have provided to the court does not include these exhibits.

2011, at 1.) Sneed was purporting to blow the whistle on misconduct and corruption in the HPD and he notified Harvey's mayor and state prosecuting authorities. We conclude that he was speaking as a citizen.

Sneed made other complaints to his immediate superiors, or else through channels for airing grievances within the HPD. This is some evidence that Sneed was speaking as an employee and not as a citizen. See, e.g., Ogden, 606 F.3d at 358-60; Spiegla, 481 F.3d at 967. But Sneed is an unusual case. He took it upon himself to investigate and publicize misconduct *within* the HPD, performing some of these activities during his extended medical leave of absence. (See, e.g., Memo addressed to Eaves/IAD, dated Jan. 21, 2011 (accusing HPD officers of impermissibly working multiple jobs simultaneously).) In a somewhat analogous situation, our Court of Appeals held that a police officer was acting as an employee when he investigated and reported misconduct outside his own unit. See Vose v. Kliment, 506 F.3d 565, 570 (7th Cir. 2008). But the Vose Court emphasized the plaintiff's role as a supervisor. See id. ("As a supervisor of the narcotics unit, it can hardly be said that Vose did not have a duty to make sure his unit's investigations were not compromised by some outside influence, or that Vose did not have a duty to coordinate his unit's work with other related units in the police department."). As far as we can tell from the record, Sneed was a rank-and-file patrol officer

without any supervisory authority.  See <u>McGarry v. McClellan</u>, No. 11 C 4601, 2012 WL 1985822, *4 (N.D. Ill. June 4, 2012) (distinguishing cases where the plaintiff exercised supervisory authority over the matters that he or she criticized or complained about).  Sneed also served numerous FOIA requests on the HPD.  The content and timing of those requests are not entirely clear, but they do indicate that Sneed was acting outside of his general responsibilities as a patrol officer.  In response to leading questions, Sneed stated that he reported misconduct in order to fulfill his duties as a police officer.  (<u>See</u> Defs.' Stmt. ¶ 61.) But we do not believe that Sneed's idiosyncratic beliefs about the scope of his duties are determinative.  <u>Cf.</u> <u>Vose</u>, 506 F.3d at 569 ("Determining the official duties of a public employee requires a *practical inquiry* into what duties the employee is *expected* to perform . . . .") (emphasis added).  We conclude that Sneed spoke as a citizen when he reported alleged misconduct to Eaves, the IAD, and others within the police department.

### b.  Whether Sneed Spoke Out on a Matter of Public Concern

To support his claim for retaliation, Sneed must also identify speech involving a matter of public concern.  <u>Kristofek v. Village of Orland Hills</u>, 712 F.3d 979, 984 (7th Cir. 2013) (citation and internal quotation marks omitted).  We conclude that Sneed addressed a matter of public concern in his memoranda accusing Eaves and others of misconduct and corruption.  (<u>See</u> Memo addressed

to Eaves/IAD, dated Jan. 21, 2011; Memo addressed to Kellogg <u>et
al.</u>, dated Mar. 28, 2011; Memo addressed to Kellogg <u>et al.</u>, dated
Apr. 11, 2011); <u>see also</u> <u>Spiegla v. Hull</u>, 371 F.3d 928, 937 (7th
Cir. 2004) ("Recognizing the 'whistleblower's' important role, our
cases have consistently held that speech alleging government
corruption and malfeasance is of public concern in its substance.")
(*overruled in part* by <u>Garcetti</u> *as recognized in* <u>Spiegla</u>, 481 F.3d
at 965-67) (collecting cases). A lawsuit may also be a form of
protected speech, <u>see</u> <u>Zorzi v. County of Putnam</u>, 30 F.3d 885, 896
(7th Cir. 1994), but "not every legal gesture — not every legal
pleading — is protected by the First Amendment." <u>Yatvin v. Madison
Metropolitan School Dist.</u>, 840 F.2d 412, 419 (7th Cir. 1988).
Sneed's April 2010 EEOC charge, which was based upon the HPD's
failure to make a reasonable accommodation, affected only him. <u>See
Kristofek</u>, 712 F.3d at 986 ("[I]f the objective of the speech — as
determined by content, form, and context — is simply to further a
purely personalized grievance, then the speech does not involve a
matter of public concern."). Sneed's September 2010 EEOC charge
couches his personal grievances in more general terms. (<u>See</u> EEOC
Charge, dated Sept. 3, 2010, at 2 (referring to the "city's current
policy and practice of discriminating against disabled officers").)
But it only describes a series of minor incidents and insults that
Sneed perceived to be retaliation for his initial April 2010 EEOC
charge. (<u>See</u> <u>id.</u> (stating that he: did not receive his uniform

allowance; did not receive his paycheck on time; was denied opportunity to participate in the officer morale survey; and was prevented from accessing the police department's "rear offices").)[24] The state-court lawsuit that Sneed filed in January 2011 is similar: he alleges that he was passed over for promotion in favor of less qualified candidates. (See Compl., Sneed v. City of Harvey, No. 20106004271.) This is a purely private concern. Sneed's federal lawsuit, Sneed v. Fox, 11-C-1923, is a somewhat closer call. In his complaint, Sneed alleged that he was falsely arrested for reporting Eaves's dangerous behavior. Police corruption is generally a matter of public concern, but that does not necessarily mean that Sneed's complaint is protected by the First Amendment. See Smith v. Fruin, 28 F.3d 646, 651 (7th Cir. 1994) ("[T]he fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render his remarks on that subject protected."). The incident that formed the basis for Sneed's lawsuit affected only him, and he sought relief only for himself. (See, e.g., Compl., Sneed v. Fox, Case No. 11-C-1923 (N.D. Ill.), Dkt. 1, ¶ 46 ("[A]s a result of FOX and EAVES' wrongful seizure, SNEED suffered severe exacerbation of his Post-Traumatic Stress Disorder and severe emotional distress.").) Moreover, he filed the lawsuit almost a year after the incident,

---

[24] Sneed's internal complaints about the same conduct are likewise not entitled to First Amendment protection.

which bolsters our conclusion that he was not acting from a desire to expose police corruption.  See Gray v. Lacke, 885 F.2d 399, 411 (7th Cir. 1989) ("[O]ur court has repeatedly held that we must look to the point of the speech to see if the plaintiff addressed a matter of public or private concern.").  We conclude that Sneed's complaint in Fox is not entitled to First Amendment protection.

### c. **Pickering** Balancing

Ordinarily, we would now proceed to balance Sneed's rights against the government's interest in "promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  This is a complex and nuanced issue that neither side has addressed.  We will assume for the sake of this decision that Sneed's interests in speaking out on those matters we have held to have been of public concern trumped the City's interest in promoting efficiency.

### 2. **Whether Sneed Suffered a Deprivation Likely to Deter Free Speech**

"[A] § 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964." Spiegla, 371 F.3d at 941.  Indeed, a campaign of minor harassment may suffice.  See, e.g., Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982).  The test is whether a person of "ordinary firmness" would be deterred from exercising his or her First Amendment rights.  See id. at 625.

- 39 -

Sneed has identified several possible deprivations: (1) Kirkwood's patrol-officer evaluation; (2) Sneed's "false arrest" on April 23, 2011; (3) the death threats he claims that he received after filing his lawsuit against Eaves; and (4) the investigation culminating in his termination. We conclude that the first two incidents are too trivial to support a claim for retaliation. See Massey v. Johnson, 457 F.3d 711, 721 (7th Cir. 2006) (alleged harassment too trivial to survive summary judgment). A single evaluation, without any tangible job consequences or other evidence suggesting that the experience was distressing,[25] would not deter a person of ordinary firmness from exercising his or her First Amendment rights. As for Sneed's false-arrest allegation, his own complaint demonstrates that the incident was trivial. Forbes told Sneed to sit and wait for Commander Wells, who then appeared and told Sneed that he was free to go as he liked and that Wells would be with him momentarily. (See Internal Memo, dated Apr. 2, 2011); see also Bart, 677 F.2d at 625 ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.").[26] These minor incidents

---

[25] Sneed has not cited any evidence suggesting that Kirkwood was unfairly critical, or even that the evaluation was especially negative.

[26] The claim also fails because Sneed has not explained why Kirkwood and Forbes — who at that point had not been implicated in any of Sneed's complaints — would have been motivated to retaliate against him. See Massey, 457 F.3d at 721 ("Ms. Mills also alleges that her supervisor assigned her additional tasks, told her to increase her productivity and, on one occasion, reprimanded her for failing to order certain supplies. Yet, these instances of 'harassment,' even if

became the subject of formal complaints, and later a federal lawsuit alleging constitutional violations, only because of Sneed's litigiousness. <u>Cf.</u> <u>Bart</u>, 677 F.2d at 625 (alleged deprivations are evaluated according to an objective standard). With respect to the death threats, Sneed merely speculates that they were made by, or ordered by, Eaves. This is insufficient to defeat summary judgment. <u>See</u> <u>McDonald v. Village of Winnetka</u>, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). However, employment termination is a deprivation likely to deter speech, <u>see, e.g.</u>, <u>Hobgood v. Illinois Gaming Bd.</u>, 731 F.3d 635, 643 (7th Cir. 2013), so we will move on to the next stage of the inquiry.

### 3. Whether Sneed's Speech was at Least a Motivating Factor in the Decision to Investigate and Terminate Sneed

With respect to causation, Sneed's First Amendment retaliation claim largely mirrors his ADA retaliation claim. (<u>See</u> <u>infra</u>.) Sneed can prove his claim using either a direct or indirect method. <u>See</u> <u>Hobgood</u>, 679 F.3d at 965. But for the reasons we explained earlier in this opinion, Sneed cannot establish prohibited retaliation under either method. The instances of protected speech that we have identified occurred closer in time to Sneed's

---

sufficient to deter free expression, were at the hands of Ms. Mills' immediate supervisor, who was not criticized in her letters and had no reason to retaliate against her.").

Case: 1:11-cv-07082 Document #: 18 Filed: 12/19/13 Page 41 of 46 PageID #:167

- 41 -

termination than his protected ADA activity. (<u>Compare</u> Defs.' Stmt. ¶ 28 (Sneed filed his second EEOC charge in September 2010); <u>with</u> Group Ex. N. to Defs.' Stmt. (memoranda created in or around March 2011 complaining about corruption in the HPD).) Nevertheless, more time elapsed than is usually considered suspicious. <u>See</u> <u>Kidwell</u>, 679 F.3d at 967. Even if the timing of the investigation supported a stronger inference of retaliation, Sneed's false accusations against Forbes were a "significant intervening event." <u>See</u> <u>id.</u> ("[W]here a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail.") (citation, brackets, and internal quotation marks omitted). The fact that Sneed spoke out about matters of public concern did not "immunize" him from the consequences of his own workplace misconduct. <u>Id.</u> Sneed has not identified any similarly situated employees to establish a prima facie case of retaliation using the indirect method. (<u>See</u> <u>supra</u>.) And even if he could make out a prima facie case, he cannot show that the proffered reason for his termination was pretextual. (<u>See</u> <u>supra</u>.) In sum, we conclude that all defendants are entitled to summary judgment on Sneed's claim for First Amendment retaliation.

## D. Retaliatory Discharge (Count V)

"To prove a common law claim of retaliatory discharge, an employee must demonstrate that (1) the employer discharged the

- 42 -

employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." Nelson v. Levy Home Entertainment, LLC, No. 10 C 3954, 2012 WL 403974, *4 (N.D. Ill. Feb. 8, 2012) (citation and internal quotation marks omitted). As we previously held with respect to his ADA and First-Amendment retaliation claims, Sneed cannot show that he was fired for any reason other than his own misconduct. See Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992) ("The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee."). The defendants are entitled to summary judgment on Sneed's claim for common law retaliatory discharge.

## E.   Equal Protection (Count VI)

Sneed has alleged a "class of one" equal protection claim challenging his termination. (See Am. Compl. ¶¶ 142-43.) To prevail on this claim, he must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." D.B. ex rel. Kurtis B. v. Kopp, 725 F.3d 681, 685 (7th Cir. 2013) (citation and internal quotation marks omitted). But the Supreme Court has declined to apply the doctrine in cases involving public employment given the inherent discretion that characterizes the employer-employee relationship. See Engquist v. Oregon Dept. of Agriculture, 553 U.S. 591, 604-605 (2008); see also id. at 609

- 43 -

("[R]atifying a class-of-one theory of equal protection in the context of public employment would impermissibly 'constitutionalize the employee grievance.'") (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 154 (1983)). Applying <u>Engquist</u>, the defendants are entitled to summary judgment on Sneed's class-of-one equal protection claim. Even if <u>Engquist</u> did not bar Sneed's claim, he could not establish the elements of a class-of-one claim. He has not cited any evidence indicating that the defendants treated similarly-situated employees differently. Moreover, his response to the defendants' motion for summary judgment barely mentions his equal-protection claim. (<u>See</u> Pl.'s Resp. at 13 ("Sneed was terminated [] as a pretext and summary judgmen[t] cannot be granted as material disputed facts exist for the Class of One Equal Protection, Due process claim, conspiracy claim, assault and battery.") (capitalization in original).) Although Sneed is representing himself, he is still required to develop and support legal arguments for denying summary judgment. <u>See, e.g.</u>, <u>Anderson v. Hardman</u>, 241 F.3d 544, 545 (7th Cir. 2001). By failing to do so, he has waived any legal argument he might have raised.

**F.    "Deprivation of Civil Rights" (Count VII)**

As we understand Count VII, Sneed has attempted to allege a procedural due process violation against the defendants based upon perceived procedural defects with his pre-termination hearing.

- 44 -

(See Am. Compl. ¶¶ 149-53.)[27]  In the course of his investigation,
Kirkwood reviewed the videotape of the Forbes incident, interviewed
Forbes and Rizzi, and attempted to interview Sneed twice.  Sneed
was given a full and fair opportunity to state his case at the pre-
termination hearing, and his termination was later upheld by an
arbitrator.  Sneed had an attorney present for both hearings.  (See
infra.) He received all the process he was due.  Moreover, like his
equal-protection claim, Sneed's response to the defendants' motion
only mentions his procedural due process claim in passing.  (See
Pl.'s Mem. at 13.)  We conclude that the defendants are entitled to
summary judgment on Count VII.

## G.   "Action for Neglect to Prevent Civil Rights Violation" (Count VIII)

In Count VIII, Sneed alleges that the defendants had the
"power to prevent or aid in preventing" Sneed's retaliatory
discharge and "neglected or refused to do so." (Am. Compl. ¶¶ 156-
57.)  It is unclear what this claim adds to Sneed's other § 1983
claims.  In any event, for the reasons we have already explained,
Sneed has not established any constitutionally prohibited

---

[27]  Besides the defendants that Sneed claims were involved (directly or
indirectly) in his pre-termination hearing, he has also named Patterson and
Alvarado as defendants to this claim.  It is unclear from the complaint what role
these defendants are supposed to have played in the hearing, and Sneed has not
cited any evidence indicating that these defendants were somehow involved in a
constitutional violation.  Therefore, Patterson and Alvarado are entitled to
summary judgment on that basis.  See Sheik-Abdi, 37 F.3d at 1248.  Even if Sneed
had cited some evidence supporting a due-process claim against these defendants,
they would still be entitled to summary judgment for the reasons we are about to
discuss.

retaliation.  The defendants are entitled to summary judgment on Count VIII.


## H.  Assault & Battery (Count IX)

Count IX is a claim against the City of Harvey for damages allegedly caused when the door "struck" Sneed.  (See Am. Compl. ¶¶ 163-66.)  The defendants argue that this claim is barred because the Illinois Workers Compensation Act ("IWCA") preempts claims against employers for intentional torts committed by co-workers. (See Defs.' Mem. at 31.)  "The IWCA is an employee's exclusive remedy for 'accidental' injuries arising out of and in the course of employment."  McPherson v. City of Waukegan, 379 F.3d 430, 442 (7th Cir. 2004).  Injuries caused by intentional torts are deemed "accidental," see id., therefore the IWCA preempts Sneed's claim for assault and battery.  Sneed does not address the defendants' preemption argument, waiving any point that he might have raised. Cf. McPherson, 379 F.3d at 442-43 n.8 (listing exceptions to IWCA preemption, none of which appear to apply on the face of Sneed's claims).  Even if Sneed's assault and battery claims were not preempted, he cannot establish the elements of either tort.  See Cohen v. Smith, 648 N.E.2d 329, 332 (Ill. Ct. App. 1995) ("[A]n actor commits a battery if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a

- 46 -

third person, or an imminent apprehension of such a contact, and
(b) a harmful contact with the person of the other directly or
indirectly results.") (quoting Rest. (Second) Torts § 13 (1965));
McNeil v. Carter, 742 N.E.2d 1277, 1281 (Ill. Ct. App. 2001) ("A
claim of assault must include an allegation of a reasonable
apprehension of an imminent battery."). Assuming that the door
touched Sneed's outstretched hand, it did so because Sneed reached
across the threshold in an apparent effort to stop it. Because
Sneed deliberately caused whatever physical contact occurred, he
cannot establish that he did not consent to the contact. Cf.
Cohen, 648 N.E.2d at 332 ("Liability for battery emphasizes the
plaintiff's lack of consent to the touching."). For the same
reason, Sneed could not have had a reasonable apprehension of
battery. If he had not deliberately moved forward, the door could
not have touched him. The defendants are entitled to summary
judgment on Count IX.[28]

## CONCLUSION

The defendants' motion for summary judgment [86] is granted in
its entirety. Sneed's motion to compel [80] is denied as moot.

DATE:        December 19, 2013

ENTER:       _____

             John F. Grady, United States District Judge

---

[28]/  The Count X claim for indemnification is rendered moot by the summary
judgment on all other counts.